### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

CLIFTON DAVID SIMS,

       Plaintiff,

  v.

DONALD J. TRUMP, in his official capacity
as President of the United States; and
UNITED STATES OF AMERICA,

       Defendants.

Case No. 1:19-cv-345 (CKK)

### DEFENDANT'S COMBINED
### RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL INFORMATION AND
### NOTICE OF SUPPLEMENTAL AUTHORITY

On July 10, 2019, plaintiff filed a Notice of Supplemental Information, ECF No. 12 ("Notice"), asking the Court to "take judicial notice of th[e] ruling" by the U.S. Court of Appeals for the Second Circuit in *Knight First Amendment Institute at Columbia University v. Trump*, No. 18-1691 (July 9, 2019), affirming *Knight First Amendment Institute at Columbia University v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) (cited in Pl.'s Mem. of Points & Auths. in Opp'n to Defs.' Mot. to Dismiss at 16, ECF No. 10). As plaintiff notes, he cited *Knight*, 302 F. Supp. 3d 451, "in support of his argument that defendant Donald J. Trump is not immune from injunctive or declaratory relief." Notice at 1. In its decision on appeal, however, the Second Circuit did not analyze the question of whether declaratory or injunctive relief could be obtained against the President, because the government "d[id] not challenge on . . . appeal" the district court's "conclu[sion] that all plaintiffs had standing to sue." *Knight First Amendment Institute at Columbia University v. Trump*, No. 18-1691, slip op. at *13 n.3.

Additionally, Defendant respectfully calls the Court's attention to the recent decision by the U.S. Court of Appeals for the Fourth Circuit in *In re Donald J. Trump*, No. 18-2486 (4th Cir. July 10, 2019) (attached hereto as Exhibit A), "grant[ing] the President's petition for a writ of mandamus and . . . revers[ing] the district court's orders, concluding that the District and Maryland lack standing under Article III."  Ex. A at 6-7.  In that appeal of *District of Columbia v. Trump*, 291 F. Supp. 3d 725 (D. Md. 2018), the government argued that separation of powers precludes courts from exercising jurisdiction over a claim for declaratory or injunctive relief against the President.  The Fourth Circuit reversed the district court's decision denying the government's motion to dismiss, finding the plaintiffs "do not have Article III standing to pursue their claims against the President," Ex. A at 36, because they had not alleged an injury-in-fact that was redressable by the relief they sought.  As the court put it:  "[W]e assess whether the District and Maryland have demonstrated that President Trump's allegedly illegal conduct — i.e., his receipt of funds from foreign and state governments patronizing the Hotel — has caused harm to their proprietary interests and that enjoining that conduct would redress such harm."  *Id.* at 28.  After performing that assessment, the court concluded "that the District and Maryland's complaint fails to make a sufficient showing." (citation omitted)).  The court further noted that "[f]or relief, moreover, the District and Maryland seek an injunction against the President himself, a form of relief that the Supreme Court has termed 'extraordinary' and has advised should 'raise[] judicial eyebrows.'"  Ex. A at 25 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992)).  Plaintiff seeks the same form of "extraordinary" relief.

Dated:  July 10, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Director
Civil Division, Federal Programs Branch

/s/ Julie Straus Harris
JULIE STRAUS HARRIS (DC Bar # 1021928)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11514
Washington, D.C. 20005
Tel: (202) 353-7633
Fax: (202) 616-8470
E-mail: julie.strausharris@usdoj.gov

*Counsel for Defendants*

# EXHIBIT A

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

------------------

**No. 18-2486**

------------------

In re DONALD J. TRUMP, President of the United States of America, in his
official capacity,

Petitioner.

------------------------------------------------

PROFESSOR CLARK D. CUNNINGHAM; PROFESSOR JESSE EGBERT,

Amici Curiae,

SCHOLAR SETH BARRETT TILLMAN; JUDICIAL EDUCATION PROJECT,

Amici Supporting Petitioner,

FORMER NATIONAL SECURITY OFFICIALS; COMMONWEALTH OF
VIRGINIA; THE NISKANEN CENTER; REPUBLICAN WOMEN FOR
PROGRESS; CHERI JACOBUS; TOM COLEMAN; EMIL H. FRANKEL; JOEL
SEARBY; ADMINISTRATIVE LAW, CONSTITUTIONAL LAW, AND
FEDERAL COURTS SCHOLARS; CERTAIN LEGAL HISTORIANS,

Amici Supporting Respondents.

------------------

On Petition for Writ of Mandamus from the United States District Court for the District
of Maryland, at Greenbelt.  Peter J. Messitte, Senior District Judge.  (8:17-cv-01596-
PJM)

------------------

Argued:  March 19, 2019                          Decided:  July 10, 2019

------------------

Before NIEMEYER and QUATTLEBAUM, Circuit Judges, and SHEDD, Senior Circuit
Judge.

––––––––––––

Petition for writ of mandamus granted; reversed and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Judge Quattlebaum and Senior Judge Shedd joined.

––––––––––––

**ARGUED:** Hashim M. Mooppan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Petitioner. Loren L. AliKhan, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Respondents. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Mark R. Freeman, Michael S. Raab, Megan Barbero, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Petitioner. Brian E. Frosh, Attorney General, Steven M. Sullivan, Solicitor General, Leah J. Tulin, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Karl A. Racine, Attorney General, Stephanie E. Litos, Assistant Deputy Attorney General, Civil Litigation Division, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C.; Norman Eisen, Laura C. Beckerman, Stuart C. McPhail, CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, Washington, D.C.; Deepak Gupta, Joshua Matz, Daniel Townsend, GUPTA WESSLER PLLC, Washington, D.C.; Joseph M. Sellers, Christine E. Webber, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., for Respondents. Craig Thomas Merritt, CHRISTIAN & BARTON, L.L.P., Richmond, Virginia, for Amici Professor Clark C. Cunningham and Professor Jesse Egbert. Carrie Severino, JUDICIAL EDUCATION PROJECT, Washington, D.C., for Amicus Judicial Education Project. Robert W. Ray, THOMPSON & KNIGHT LLP, New York, New York; Josh Blackman, Houston, Texas, for Amicus Scholar Seth Barrett Tillman. Jan I. Berlage, GOHN HANKEY & BERLAGE LLP, Baltimore, Maryland, for Amicus Scholar Seth Barrett Tillman and The Judicial Education Project. Harold Hongju Koh, Rule Of Law Clinic, YALE LAW SCHOOL, New Haven, Connecticut; Phillip Spector, MESSING & SPECTOR LLP, Baltimore, Maryland, for Amici National Security Officials. Mark R. Herring, Attorney General, Toby J. Heytens, Solicitor General, Matthew R. McGuire, Principal Deputy Solicitor General, Michelle S. Kallen, Deputy Solicitor General, Brittany M. Jones, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Colin E. Wrabley, Devin M. Misour, Brian T. Phelps, Pittsburgh, Pennsylvania, M. Patrick Yingling, REED SMITH LLP, Chicago, Illinois, for Amici The Niskanen Center, Republican Women for Progress, Cheri Jacobus, Tom Coleman, Emil H. Frankel, and Joel Searby. Regina Kline, Jean M. Zachariasiewicz, Anthony J. May, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Amici Administrative Law, Constitutional Law, and Federal Courts Scholars. H. Laddie Montague, Jr., Eric J. Cramer, Candace J. Enders, BERGER & MONTAGUE, P.C., Philadelphia, Pennsylvania; Erica C. Lai, Melissa H. Maxman, COHEN & GRESSER LLP, Washington, D.C., for Amici Certain Legal Historians.

––––––––––––

NIEMEYER, Circuit Judge:

The District of Columbia and the State of Maryland commenced this action against Donald J. Trump in his official capacity as President of the United States and in his individual capacity, alleging that he violated the Foreign and Domestic Emoluments Clauses of the U.S. Constitution.  The Foreign Emoluments Clause provides that no officer of the United States shall "accept" any "present, Emolument, Office, or Title . . . from any King, Prince, or foreign State."  U.S. Const. art. I, § 9, cl. 8.  And the Domestic Emoluments Clause provides that the President shall receive "Compensation" "for his Services" but not "any other Emolument" from the United States or any State.  U.S. Const. art. II, § 1, cl. 7.  The District and Maryland contend that the President's "continued ownership interest in a global business empire" provides him with "millions of dollars in payments, benefits, and other valuable consideration from foreign governments and persons acting on their behalf, as well as federal agencies and state governments," and that the President is therefore receiving "emoluments" that are prohibited by the Clauses.

In their complaint, the District and Maryland allege that the President's ongoing constitutional violations harm their sovereign, quasi-sovereign, and proprietary interests, particularly (1) Maryland's interest as a separate sovereign State in securing adherence to the terms on which it agreed to enter the Union; (2) the District and Maryland's interests in not being pressured to grant, or being perceived as granting, "special treatment to the [President] and his extensive affiliated enterprises"; (3) the District and Maryland's interests in protecting the economic well-being of their residents, who, as competitors of

3

the President, are injured by "decreased business, wages, and tips resulting from economic and commercial activity diverted" to the President's businesses; (4) Maryland's interest in avoiding a "reduction in tax revenue that flows from [the alleged] violations"; and (5) the District and Maryland's interests as proprietors of businesses that compete with the President's businesses.  For relief, the District and Maryland seek a declaratory judgment that the President has violated the Emoluments Clauses and injunctive relief prohibiting future violations.

The President, in his official capacity, filed a motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), contending, among other things, that the District and Maryland lack standing to bring their action; that they do not have equitable causes of action to enforce the Emoluments Clauses; and that he has not received "emoluments" as prohibited by the Clauses.  The President also filed a separate motion to dismiss in his individual capacity under Rules 12(b)(1) and 12(b)(6), contending additionally that he has absolute immunity.

The district court treated the President's motions piecemeal.  First, by an opinion and order dated March 28, 2018, the court denied the President's motion filed in his official capacity "insofar as it dispute[d] Plaintiffs' standing to challenge the involvement of the President with respect to the Trump International Hotel in Washington, D.C. and its appurtenances and any and all operations of the Trump Organization with respect to the same"; it granted the motion with respect to the "operations of the Trump Organization and the President's involvement in the same outside the District of Columbia," concluding that the District and Maryland lacked standing to pursue any

4

claims premised on such operations; and it deferred ruling on the other questions raised by the motion.  The court also deferred ruling on the motion filed by the President in his individual capacity.   Then, by an opinion and order dated July 25, 2018, the court concluded that the District and Maryland's complaint stated valid claims under the Emoluments Clauses and accordingly denied the President's motion to dismiss filed in his official capacity insofar as the claims were made against him with respect to the Trump International Hotel and all its appurtenances in Washington, D.C.  The court again deferred ruling on the President's motion to dismiss filed in his individual capacity, which included the President's assertion of absolute immunity.  Also with the July 25 order, the court directed the parties to submit a joint recommendation with respect to the next steps to be taken in the litigation, including an outline of proposed discovery.

The President, contending that the district court's rulings in both orders involved "controlling question[s] of law as to which there [was] substantial ground for a difference of opinion and that an immediate appeal from the order[s] [would] materially advance the ultimate termination of the litigation," filed a motion with the district court requesting that the court certify its orders for appeal under 28 U.S.C. § 1292(b).  By order dated November 2, 2018, the court denied the motion, concluding that "the President has failed to identify a controlling question of law decided by this court as to which there is a substantial ground for difference of opinion justifying appellate review that would materially advance the ultimate termination of the case or even the material narrowing of issues."  This ruling left the action to proceed forward in the district court, including discovery against the President.

Seeking to avoid "intrusive discovery into [his] personal financial affairs and the official actions of his Administration," the President in his official capacity then filed a petition for a writ of mandamus in this court seeking an order (1) directing the district court to certify its orders for appeal under § 1292(b), or (2) directing the court to dismiss the District and Maryland's complaint outright.  He also filed a motion for a stay of the district court proceedings.  While acknowledging that "a district court normally has wide discretion to determine whether the criteria for certification under § 1292(b) are satisfied," the President contends that mandamus "is a necessary safety valve in the extraordinary situation here, where a district court has insisted in retaining jurisdiction over what all reasonable jurists would recognize is a paradigmatic case for certification of [an] interlocutory appeal under § 1292(b)."  The President also filed an appeal with respect to the court's failure to address his assertion of absolute immunity on the claims made against him in his individual capacity, contending that by opening discovery against him, the court effectively denied him immunity.

By order dated December 20, 2018, we granted the President's motion for a stay of the proceedings in the district court pending our rulings on his petition for a writ of mandamus and his appeal.  We also determined to consider separately the mandamus petition and the appeal, ordering oral arguments on them seriatim.

We now grant the President's petition for a writ of mandamus and, exercising jurisdiction through operation of § 1292(b), reverse the district court's orders, concluding that the District and Maryland lack standing under Article III.  And in the separate appeal, No. 18-2488, that we also decide today, we likewise reverse due to the District

and Maryland's lack of standing.  Based on the decisions in this appeal and in appeal No. 18-2488, we remand with instructions to dismiss the complaint with prejudice.

I

The District and Maryland's complaint alleges that the President's continued interest in the Trump Organization — specifically in hotels and related properties — results in him receiving "emoluments" from various government entities and officials, both foreign and domestic, and that such receipts violate the Foreign and Domestic Emoluments Clauses of the U.S. Constitution.

With regard to the Foreign Emoluments Clause, the complaint alleges that the President is benefiting and will continue to benefit from the business conducted by the Trump Organization with foreign governments, instrumentalities, and officials.  Focusing on the Trump International Hotel in Washington, D.C., in which the President has a 76% interest, the complaint alleges that the Hotel markets itself to the diplomatic community and that, as a result, (1) the Embassy of Kuwait held its National Day celebration at the Hotel on February 22, 2017, spending an estimated $40,000 to $60,000; (2) the Kingdom of Saudi Arabia "spent thousands of dollars on rooms, catering, and parking" at the Hotel in January and February 2017; and (3) Georgia's Ambassador and Permanent Representative to the United Nations stayed at the Hotel at the Georgian government's expense.  Beyond benefits received from the Hotel, the complaint also alleges that the President has violated the Foreign Emoluments Clause by receiving (1) income from various foreign states and foreign officials patronizing Trump Tower and Trump World

Tower in New York City; (2) a favorable trademark decision from the Chinese government; (3) income from the international distribution of "The Apprentice" and its spinoffs; and (4) income from real estate projects in which the Trump Organization is engaged in the United Arab Emirates and Indonesia.

With regard to the Domestic Emoluments Clause, the complaint, again focusing on the Trump International Hotel, alleges that the Hotel, which leases the Old Post Office Building from the General Services Administration ("GSA"), a federal agency, received a benefit from the GSA in March 2017, after the President was inaugurated.    While the Hotel's lease agreement provided that "no . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom," the GSA amended the lease agreement and issued a letter stating that the Hotel "is in full compliance with [the Lease] and, accordingly, the Lease is valid and in full force and effect."   The complaint claims that this "forbearing from enforcing" the terms of the original lease agreement amounted to an "emolument" in violation of the Domestic Emoluments Clause.

The complaint also alleges that the President, "through entities he owns," is seeking a $32 million historic-preservation tax credit for the Hotel and that, if the National Park Service approves the credit, it "may constitute an emolument, in violation of the Domestic Emoluments Clause."

Finally, the complaint alleges that the State Department and U.S. Embassies have promoted the Mar-a-Lago Club — a business owned by the President in Palm Beach, Florida — and that "federal, state, and local governments, or their instrumentalities have

made and will continue to make payments for the use of the facilities owned or operated by [the President] for a variety of functions."

To support their standing to sue the President, the District and Maryland allege that because of the President's constitutional violations, they suffer "harm to their sovereign and/or quasi-sovereign interests," as well as "proprietary and other financial harms."   Regarding sovereign interests in particular, Maryland alleges that it has a "sovereign interest in enforcing the terms on which it agreed to enter the Union," and the District and Maryland allege that each has an interest in the enforcement of its laws relating to property that the President or his business organizations own or might seek to acquire.

With respect to the District and Maryland's quasi-sovereign interests, the complaint alleges that:

> The [President's] acceptance or receipt of presents and emoluments in violation of the Constitution presents the District and Maryland with an intolerable dilemma: either (1) grant the [Trump] Organization's requests for concessions, exemptions, waivers, variances, and the like and suffer the consequences, potentially including lost revenue and compromised enforcement of environmental protection, zoning, and land use regulations, or (2) deny such requests and be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions.

In addition, the complaint alleges that the District and Maryland have a *parens patriae* interest in protecting their citizens from economic injury caused by the "payment of presents and emoluments to the [President's businesses]," asserting that such payments "tilt[] the competitive playing field toward [his] businesses, causing competing companies and their employees to lose business, wages, and tips."

9

The complaint also alleges that the President's constitutional violations harm Maryland's tax revenue, stating in particular that the Trump International Hotel will have an adverse effect on tax revenue from the National Harbor development in Prince George's County.

Finally, with respect to their proprietary interests, the District alleges that it has a financial interest in the Walter E. Washington Convention Center, the D.C. Armory, and the Carnegie Library, and that its interests in those properties has been harmed by the President's receipt of emoluments through the Trump International Hotel, which gives the Hotel an unlawful competitive advantage. Maryland alleges similarly that it has a financial interest in the Montgomery County Conference Center in Bethesda and that the Center will suffer economic harm due to the competitive disadvantage resulting from the President's violations of the Emoluments Clauses.

For relief, the District and Maryland seek a declaratory judgment that the President is violating the Emoluments Clauses and an injunction prohibiting future violations.

The President, in his official capacity, filed a motion to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), contending that the District and Maryland lack standing and that he has not violated the Emoluments Clauses. He also filed a separate motion to dismiss in his individual capacity, contending that he has absolute immunity. The district court treated the issues raised by the President's motions separately.

By an opinion and order dated March 28, 2018, the district court rejected the President's challenge to the District and Maryland's standing insofar as their claims were

made in connection with the Trump International Hotel and its appurtenances in Washington, D.C.  The court found that the District and Maryland had "stated cognizable injuries to their quasi-sovereign, proprietary, and *parens patriae* interests" and concluded that such injuries were directly traceable to the President's alleged violations of the Emoluments Clauses.  But the court granted the President's motion to the extent that the District and Maryland's claims were based on the operations of the Trump Organization *outside* the District of Columbia.

Particularly as to the District and Maryland's alleged quasi-sovereign interests, the district court noted that Trump Organization hotels had obtained "substantial tax concessions" from the District and from the State of Mississippi; that the GSA had amended the Hotel's lease agreement; and that the Governor of Maine had stayed at the Hotel during an official visit to Washington in the spring of 2017, suggesting that the District and Maryland "may very well feel themselves obliged, *i.e.*, coerced, to patronize the Hotel in order to help them obtain federal favors."

As for the District and Maryland's proprietary interests, the court concluded that Maryland had sufficiently alleged injury based on competitive harm to the Montgomery County Conference Center and that the District had sufficiently alleged injury based on competitive harm to the Washington Convention Center.  The court stated that the District and Maryland had "alleged sufficient facts to show that the President's ownership interest in the Hotel has had and almost certainly will continue to have an unlawful effect on competition, allowing an inference of impending (if not already occurring) injury" to Maryland and the District's proprietary interests.

And regarding the District and Maryland's *parens patriae* interests, the court concluded that both the District and Maryland "have sufficiently stated a concrete injury-in-fact to their *parens patriae* interest in protecting the economic welfare of their residents."  Citing the large size of the hospitality industry within and bordering Washington, D.C., the court reasoned that "a large number of Maryland and District of Columbia residents are being affected and will continue to be affected when foreign and state governments choose to stay, host events, or dine at the Hotel rather than at comparable Maryland or District of Columbia establishments, in whole or in substantial part simply because of the President's association with it."

In its March 28, 2018 opinion and order, the district court deferred ruling on the remaining issues raised by the President's motion filed in his official capacity.  It also deferred ruling on the President's separate motion filed in his individual capacity.

On July 25, 2018, the district court issued another opinion and order, holding that the term emolument means "any profit, gain, or advantage" and that the various benefits alleged in the complaint to have been received by the President therefore qualified as "emoluments" under the Emoluments Clauses.  In this opinion, the district court again deferred ruling on the President's motion to dismiss the claims against him in his individual capacity, thus declining again to address the President's assertion of absolute immunity.  Nonetheless, the court allowed the case to proceed with discovery.

In short, the district court denied the President's motion to dismiss the claims against him in his official capacity insofar as they pertained to the Trump International

Hotel in Washington, D.C.  And it deferred ruling on the President's motion to dismiss the claims against him in his individual capacity.

The President then filed a motion requesting that the district court certify its orders for appeal pursuant to 28 U.S.C. §1292(b).  But the court denied the motion, concluding that its orders did not satisfy the statute's criteria that an order involve a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from such order would materially advance the ultimate termination of the litigation.  In so concluding, the court reiterated the reasoning of its earlier rulings.

Following the district court's denial of his motion for § 1292(b) certification, the President, in his official capacity, filed a petition for a writ of mandamus in this court, seeking an order "directing the district court to certify its orders denying dismissal of [the] plaintiffs' complaint for immediate appellate review" or "directing the district court to dismiss [the] plaintiffs' complaint outright."  He also requested a stay of the district court proceedings pending resolution of the petition.

By order dated December 20, 2018, we granted the President's request for a stay and scheduled the President's petition for oral argument, directing that the parties be prepared to argue "not only the procedural issues regarding the mandamus petition but also the underlying issues of (1) whether the two Emoluments Clauses provide plaintiffs with a cause of action to seek injunctive relief and (2) whether the plaintiffs have alleged legally cognizable injuries sufficient to support standing to obtain relief against the President."  We conducted oral argument on March 19, 2019.

II

With his petition for a writ of mandamus, the President requests that we direct the district court to certify for interlocutory appeal under 28 U.S.C. § 1292(b) its orders of March 28 and July 25, 2018, which the court refused to do.  That request is indeed an extraordinary one, as petitions for writs of mandamus are rarely given, and the district court's refusal to certify was an exercise of broad discretion.  But, in the same vein, the District and Maryland's suit is also an extraordinary one.

First, the suit is brought directly under the Constitution without a statutory cause of action, seeking to enforce the Emoluments Clauses which, by their terms, give no rights and provide no remedies.  Second, the suit seeks an injunction directly against a sitting President, the Nation's chief executive officer.  Third, up until the series of suits recently brought against this President under the Emoluments Clauses, no court has ever entertained a claim to enforce them.  Fourth, this and the similar suits now pending under the Emoluments Clauses raise novel and difficult constitutional questions, for which there is no precedent.  Fifth, the District and Maryland have manifested substantial difficulty articulating how they are harmed by the President's alleged receipts of emoluments and the nature of the relief that could redress any harm so conceived.  Sixth, to allow such a suit to go forward in the district court without a resolution of the controlling issues by a court of appeals could result in an unnecessary intrusion into the duties and affairs of a sitting President.  Accordingly, not only is this suit extraordinary, it also has national significance and is of special consequence.

The criteria for granting petitions for writs of mandamus and § 1292(b) certifications are well established.  A party seeking a writ of mandamus must demonstrate (1) that it has a "clear and indisputable" right; (2) that there are "no other adequate means" to vindicate that right; and (3) that the writ is "appropriate under the circumstances." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004).  Under these principles, it is understood that a writ of mandamus can properly issue to remedy a "clear abuse of discretion." *Id.* at 390 ("[U]nder principles of mandamus jurisdiction, the Court of Appeals may exercise its power to issue the writ only upon a finding of 'exceptional circumstances amounting to a judicial usurpation of power,' or a '*clear abuse of discretion*.'  As this case implicates the separation of powers, the Court of Appeals must also ask, as part of this inquiry, whether the District Court's actions constituted an *unwarranted impairment* of another branch in the performance of its constitutional duties" (emphasis added) (citations omitted)).

To be sure, the discretion conferred on district courts by § 1292(b) is broad.  *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995).  The statute provides that a district court "shall" certify its order for interlocutory appeal when the court determines that its order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *see also, e.g.*, *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011).  The broad discretion given to district courts under § 1292(b) is reflected in the open-ended terms used to define the statutory criteria.  When a district court determines that

the statutory criteria are present, however, it has a "*duty . . .* to allow an immediate appeal

to be taken." *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th

Cir. 2000) (emphasis added); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S.

100, 110–11 (2009).   And when a district court's discretion in applying the statutory

criteria is not "guided by sound legal principles," but by "whim," a court of appeals may

conclude that the court's actions amounted to a clear abuse of discretion.   *Halo Elecs.,*

*Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931–32 (2016) (cleaned up) (addressing

generally the nature of "discretion").

In this case, although the district court recognized the Supreme Court's instruction

that "district courts should not hesitate to certify an interlocutory appeal" under § 1292(b)

when a decision "involves *a new legal question* or *is of special consequence*," *Mohawk*,

558 U.S. at 111 (emphasis added), as well as its "duty" to certify when the statutory

criteria are met, *Ahrenholz*, 219 F.3d at 677, it refused to certify its orders for appeal.

Rather, it simply reiterated its earlier reasoning, relying on its belief that it was

unquestionably correct and therefore that there existed no substantial ground for

difference of opinion.

Yet, as the President noted, the district court was "the first ever to permit a party to

pursue relief under the Emoluments Clauses for alleged competitive injury — or for any

injury for that matter."   The district court dismissed this novelty by reciting the general

proposition that "numerous cases have found that a firm has constitutional standing to

challenge a competitor's entry into the market," providing no citation that would make

that proposition applicable to a direct claim under the Constitution, let alone a direct

claim under the Emoluments Clauses.  In doing so, the court failed to recognize, among other things, that no previous court had enforced the Emoluments Clauses; that no decision had defined what "emoluments" are; that no prior decision had determined that a party can sue directly under the Emoluments Clauses when the constitutional provisions provide no rights and specify no remedies; and that no case had held that a State has standing to sue the President for alleged injury to its proprietary or sovereign interests from a violation of the Emoluments Clauses.  One can hardly question that these are "new legal question[s]" of "special consequence."  *Mohawk*, 558 U.S. at 111.

And quite apart from the novelty of the issues presented, the President also pointed to *Citizens for Responsibility & Ethics in Washington ("CREW") v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017), to show a reasonable difference of opinion.  But the district court dismissed the apparent disagreement between its reasoning and the reasoning in *CREW* out of hand, asserting without further explanation that the "President's reliance on the *CREW* decision reflects — at best — an instance of judges applying the law differently.  It does not demonstrate, as is required for interlocutory appeal, that courts themselves disagree as to what the law is."  (Cleaned up).

In *CREW*, the Southern District of New York concluded that plaintiffs representing the hospitality industry lacked standing to bring an Emoluments Clauses suit against President Trump and that the plaintiffs' alleged injuries were not within the "zone of interests" of the Clauses.  276 F. Supp. 3d at 184–88.  Like the District and Maryland, the plaintiffs in *CREW* alleged that President Trump's violations of the Clauses granted him an unlawful competitive advantage in the hospitality industry and sought

17

competitors' standing on that ground.  *See id*. at 180–83.  In fact, they alleged *exactly* the same anecdotes as the District and Maryland allege here about foreign diplomats patronizing the President's hotels, *see id.* at 182, and likewise pointed to the GSA's amendment of the Trump International Hotel's lease agreement, claiming that it amounted to an impermissible emolument, *id.* at 182–83.  The *CREW* court concluded that the plaintiffs had "failed to properly allege that [the President's] actions *caused* [the plaintiffs'] competitive injury and that such an injury [was] *redressable*" by the court.  It reasoned:

> Even before Defendant took office, he had amassed wealth and fame and was competing against the Hospitality Plaintiffs in the restaurant and hotel business.  It is only natural that interest in his properties has generally increased since he became President.  As such, despite any alleged violation on Defendant's part, the Hospitality Plaintiffs may face a tougher competitive market overall.  Aside from Defendant's public profile, there are a number of reasons why patrons may choose to visit Defendant's hotels and restaurants including service, quality, location, price and other factors related to individual preference.  Therefore, the connection between the Hospitality Plaintiffs' alleged injury and Defendant's actions is too tenuous to satisfy Article III's causation requirement.

> Moreover, the Hospitality Plaintiffs cannot establish that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  Plaintiffs seek an injunction preventing Defendant from violating the Emoluments Clauses.  They argue that such injunction would "stop the source of intensified competition and provide redress."  Even if it were determined that the Defendant personally accepting any income from the Trump Organization's business with foreign and domestic governments was a violation of the Emoluments Clauses, it is entirely speculative what effect, if any, an injunction would have on the competition Plaintiffs claim they face.

> . . . Were Defendant not to personally accept any income from government business, this Court would have no power to lessen the competition inherent in any patron's choice of hotel or restaurant. . . .  [T]he Emoluments Clauses prohibit Defendant from receiving gifts and

emoluments.  They do not prohibit Defendant's businesses from competing directly with the Hospitality Plaintiffs.  Furthermore, notwithstanding an injunction from this Court, Congress could still consent and allow Defendant to continue to accept payments from foreign governments in competition with Plaintiffs.

Thus, while a court order enjoining Defendant may stop his alleged constitutional violations, it would not ultimately redress the Hospitality Plaintiffs' alleged competitive injuries.

*Id.* at 185–87 (cleaned up).  In addition, the *CREW* court concluded that there was "simply no basis to conclude" that the plaintiffs' alleged competitive injuries fell "within the zone of interests that the Emoluments Clauses sought to protect," reasoning:

[T]here can be no doubt that the intended purpose of the Foreign Emoluments Clause was to prevent official corruption and foreign influence, while the Domestic Emoluments Clause was meant to ensure presidential independence.  Therefore, the Hospitality Plaintiffs' theory that the Clauses protect them from increased competition in the market for government business must be rejected, especially when (1) the Clauses offer no protection from increased competition in the market for non-government business and (2) with Congressional consent, the Constitution allows federal officials to accept foreign gifts and emoluments, regardless of its effect on competition.  With Congress's consent, the Hospitality Plaintiffs could still face increased competition in the market for foreign government business but would have no cognizable claim to redress in court.

*Id.* at 188.

The *CREW* court's disagreement with the theory of competitor standing embraced by the district court is fundamental and obvious, and the district court's suggestion to the contrary blinks reality.  "A substantial ground for difference of opinion exists *where reasonable jurists might disagree* on an issue's resolution."  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (emphasis added).  That is undeniably the case here.

19

Moreover, there can be no doubt that the questions the President sought to have certified under § 1292(b) were "controlling" and that their prompt appellate resolution could "materially advance the ultimate termination of the litigation." *See Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) (noting that "controlling" in § 1292(b) "means serious to the conduct of the litigation, either practically or legally" (citation omitted)); *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) ("[T]he text of § 1292(b) requires that resolution of a 'controlling question of law . . . may materially advance the ultimate termination of the litigation.'  This is not a difficult requirement to understand.  It means that resolution of a controlling legal question would serve to avoid a trial or otherwise substantially shorten the litigation" (citation omitted)).

At bottom, we agree with the President that this is a paradigmatic case for certification under § 1292(b) and that the district court's reasons for not certifying its orders were not "guided by sound legal principles." *Halo Elecs.,* 136 S. Ct. at 1231; *see also Mohawk*, 558 U.S. at 110–11.  The court's refusal to certify therefore amounted to a clear abuse of discretion.

Because there is no other mechanism for prompt appellate review of the threshold legal issues raised by the District and Maryland's complaint, which asserts unprecedented claims directly against a sitting President, *see Cheney*, 542 U.S. at 382 (recognizing the "paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties"), and because the district court erred so clearly in applying the § 1292(b) criteria, we conclude that granting the President's petition for mandamus is appropriate.

20

In reaching this conclusion, however, we are quick to note that disturbing an exercise of the broad discretion conferred on district courts to determine whether to certify orders for interlocutory appeal should be rare and occur *only* when a clear abuse of discretion is demonstrated. This is so because § 1292(b), while mandating certification when the statutory criteria are met, nonetheless places broad discretion for finding that the criteria are satisfied in the district courts. The statute confers discretion on courts of appeals as a separate and distinct responsibility for its operation, providing that "[t]he Court of Appeals . . . may thereupon [after the district court's certification], *in its discretion*, permit an appeal to be taken from such order." 28 U.S.C. § 1292(b) (emphasis added). The proper operation of § 1292(b) thus occurs only when *both* the district court *and* the court of appeals exercise their independently assigned discretion. But this does not mean that the district court's discretion in refusing to certify is unfettered and unreviewable, and the statute does not so provide. *See Fernandez-Roque v. Smith*, 671 F.2d 426, 431–32 (11th Cir. 1982) (issuing a writ of mandamus directing the district court to rule on whether it had subject-matter jurisdiction and then certify that ruling for interlocutory appeal under § 1292(b), concluding that the case "present[ed] the truly 'rare' situation in which it [was] appropriate for [the appellate court] to require certification of a controlling issue of national significance"); *In re McClelland Eng'rs, Inc.*, 742 F.2d 837, 837, 839 (5th Cir. 1984) (concluding that "the [district] court's refusal to certify [under § 1292(b)] in the circumstances constitute[d] an abuse of discretion," vacating the order denying § 1292 certification, and sending the case back with a "request that the district court certify its interlocutory order for appeal").

21

Accordingly, in the unique circumstances of this case, we grant the President's petition for a writ of mandamus directing the district court to certify its orders of March 28 and July 25 for interlocutory appeal. And, rather than remand the case to the district court simply to have it pointlessly go through the motions of certifying, we will take the district court's orders as certified and grant our permission to the President to appeal those orders, thus taking jurisdiction under § 1292(b).

## III

Turning to the motion to dismiss the official-capacity claims against the President filed in the district court, the President presented numerous arguments to the district court flowing from the complex question of "whether and when the President is subject to suit under the Emoluments Clauses." The Foreign Emoluments Clause provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8. And the Domestic Emoluments Clause provides:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

U.S. Const. art. II, § 1, cl. 7. Neither Clause expressly confers any rights on any person, nor does either Clause specify any remedy for a violation. They are structural provisions concerned with public corruption and undue influence. In particular, the Foreign Emoluments Clause is concerned with preventing U.S. officials from being corrupted or

unduly influenced by gifts or titles from foreign governments.  *See* 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., 1911) ("Mr. Pinkney urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence and moved to insert [the Foreign Emoluments Clause]"); 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 465 (Jonathan Elliot ed., 2d ed. 1836) ("The [Foreign Emoluments Clause] restrains any person in office from accepting of any present or emolument, title or office, from any foreign prince or state. . . .  This restriction is provided to prevent corruption").  And the Domestic Emoluments Clause is concerned with ensuring presidential independence and preventing the President from being improperly swayed by the States.  *See* The Federalist No. 73, at 378–79 (Alexander Hamilton) (George W. Carey & James McClellan eds., 1990) ("Neither the Union nor any of its members will be at liberty to give, nor will he be at liberty to receive any other emolument, than that which may have been determined by the first act.  He can of course have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution").

As the Clauses do not expressly confer any rights or provide any remedies, efforts to enforce them in courts have been virtually nonexistent prior to President Trump's inauguration in 2017.  In 2017, however, three separate complaints were filed against the President alleging Emoluments Clauses violations, including the complaint filed in this case.  *See* Complaint, *CREW*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017) (No. 17 Civ. 458); Complaint, *Blumenthal v. Trump*, No. 1:17-cv-1154 (D.D.C. June 14, 2017); Complaint, *District of Columbia v. Trump*, No. 8:17-cv-1596 (D. Md. June 12, 2017).

In view of the nature, purpose, and language of the Clauses, there are numerous issues that would have to be resolved in allowing the case against the President to go forward.  Because the District and Maryland have no express cause of action, statutory or otherwise, they rely on the district court's "inherent authority to grant equitable relief," citing the Supreme Court's recognition that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).  The President acknowledges this authority in the abstract but points to the Supreme Court's instruction that "[t]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief . . . depend on traditional principles of equity jurisdiction" and contends that the relief sought by the District and Maryland was not "traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999) (cleaned up).  As the President notes, the classic type of case in which plaintiffs sue to enjoin unconstitutional conduct without a statutory cause of action involves the "anti-suit injunction," a traditional equitable remedy that "permit[s] potential defendants in legal actions to raise in equity a defense available at law."  *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014).  Because the District and Maryland's suit falls outside the scope of this traditional type of case, the President contends that allowing the suit to proceed would in effect recognize an entirely new class of equitable action.

Beyond that threshold question lie issues relating to whether the District and Maryland have an interest sufficient to bring a suit under the Emoluments Clauses. Not only would they need to show that the alleged violation caused them harm, but they might also need to show that such harm fell within the zone of interests protected by the Clauses. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 469 (1992) (Scalia, J., dissenting). The President maintains that the interests asserted by the District and Maryland are "so marginally related to the Emoluments Clauses' zone of interests" that they do not "remotely establish the type of private right needed" to make such a showing.

For relief, moreover, the District and Maryland seek an injunction against the President himself, a form of relief that the Supreme Court has termed "extraordinary" and has advised should "raise[] judicial eyebrows." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992).

But while these issues presented by the President to the district court do indeed raise an array of substantial questions about the viability of this action, the threshold matter to be decided is whether the District and Maryland have standing under Article III to pursue their claims, a question that goes to our judicial power.

IV

The requirements for Article III standing are well established, and they apply in all cases regardless of the plaintiff or the particular theory of standing being asserted.  As the Supreme Court has explained:

> In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.  Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action.  This limitation is founded in concern about the proper — and properly limited — role of the courts in a democratic society.
>
> The doctrine of standing is one of several doctrines that reflect this fundamental limitation.  It requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.  He bears the burden of showing that he has standing for each type of relief sought.  To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.  This requirement assures that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (cleaned up).  And, of course, an "assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982) (cleaned up); *cf. United States v. Richardson*, 418 U.S. 166, 179 (1974) ("[T]he absence of" a proper "individual or class to litigate" supports the conclusion that "the subject matter is committed to . . . the political process").

26

In denying the President's motion to dismiss based on a lack of standing, the district court concluded that the District and Maryland sufficiently showed standing based on (1) the alleged harm to their proprietary interests in properties that were in competition with the Trump International Hotel in Washington, D.C.; (2) the alleged harm to their *parens patriae* interests on behalf of their residents' competitive interests that were similarly harmed; and (3) the alleged harm to their other quasi-sovereign interests in not being pressured to grant the President's businesses favorable treatment. The District and Maryland rely on these theories on appeal, and we address each in turn.

A

The district court held that the District and Maryland have standing based on harm to the District's proprietary interest in the Washington Convention Center and Maryland's proprietary interest in the Montgomery County Conference Center, reasoning that the President's receipt of emoluments from the Trump International Hotel provides the Hotel with an illegal competitive advantage and thus diverts business away from these properties.  In so holding, the court accepted the District and Maryland's invocation of the "competitive standing doctrine," the "nub" of which is that "when a challenged [government] action authorizes allegedly illegal transactions that will *almost surely* cause [the plaintiff] to lose business, there is no need to wait for injury from specific transactions."  *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001) (citation omitted).

27

But even were the "competitive standing doctrine" to be accepted in this circuit, the doctrine is an *application* of Article III standing principles, not a relaxation of them. *See DEK Energy*, 248 F.3d at 1195.  Thus, we must still determine whether the standard requirements for Article III standing are satisfied.  And to do so, we assess whether the District and Maryland have demonstrated that President Trump's allegedly illegal conduct — *i.e.*, his receipt of funds from foreign and state governments patronizing the Hotel — has *caused* harm to their proprietary interests and that enjoining that conduct would *redress* such harm.  *See Summers*, 555 U.S. at 492–93.  Upon conducting that assessment, we conclude that the District and Maryland's complaint fails to make a sufficient showing.

To begin, the District and Maryland's theory of proprietary harm hinges on the conclusion that government customers are patronizing the Hotel *because the Hotel distributes profits or dividends to the President*, rather than due to any of the Hotel's other characteristics.   Such a conclusion, however, requires speculation into the subjective motives of independent actors who are not before the court, undermining a finding of causation.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"); *Bennett v. Spear*, 520 U.S. 154, 167 (1997) ("[T]he injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28, 42–43, 45–46 (1976) (holding that indigent plaintiffs, who alleged that a regulation affording favorable tax

treatment to certain hospitals that provided only limited services to indigent patients "encouraged" those hospitals to deny them service, lacked standing to challenge the regulation, reasoning that it was "purely speculative whether the denials of service specified in the complaint fairly [could] be traced" to the regulation or "instead result[ed] from decisions made by the hospitals without regard to the tax implications" and that it was "equally speculative" whether the plaintiffs' desired injunction would result in them receiving service); *Linda R.S. v. Richard D.*, 410 U.S. 614, 615–19 (1973) (holding that a mother lacked standing to seek an injunction to force the prosecution of her child's father for failing to pay child support, reasoning that because prosecution would result only in the father being jailed, it was overly "speculative" whether an injunction would result in future child support payments); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (dismissing for lack of Article III standing, reasoning that the plaintiff's theory of standing "depend[ed] on the independent actions of third parties, [thus] distinguishing its case from the 'garden variety competitor standing cases' which require a court to simply acknowledge a chain of causation 'firmly rooted in the basic law of economics'" (citation omitted)); *Am. Soc. of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 150 (D.C. Cir. 1977) (concluding that plaintiffs' claim of competitive harm was "too speculative to support standing," reasoning that customers "might for a variety of reasons continue to prefer" competitors even if the plaintiffs prevailed).

Indeed, there is a distinct possibility — which was completely ignored by the District and Maryland, as well as by the district court — that certain government officials might *avoid* patronizing the Hotel because of the President's association with it. *See*

*United Transp. Union v. ICC*, 891 F.2d 908, 914 (D.C. Cir. 1989) (rejecting standing where it was "wholly speculative" whether the challenged conduct would "harm rather than help" the plaintiffs).  And, even if government officials were patronizing the Hotel to curry the President's favor, there is no reason to conclude that they would cease doing so were the President enjoined from receiving income from the Hotel.  After all, the Hotel would still be publicly associated with the President, would still bear his name, and would still financially benefit members of his family.  In short, the link between government officials' patronage of the Hotel and the Hotel's payment of profits or dividends to the President himself is simply too attenuated.

Moreover, the likelihood that an injunction barring the President from receiving money from the Hotel would not cause government officials to cease patronizing the Hotel demonstrates a lack of redressability, independently barring a finding of standing. This deficiency was remarkably manifested at oral argument when counsel for the District and Maryland, upon being questioned, was repeatedly unable to articulate the terms of the injunction that the District and Maryland were seeking to redress the alleged violations.  When plaintiffs before a court are unable to specify the relief they seek, one must wonder why they came to the court for relief in the first place.

At bottom, the District and Maryland are left to rest on the theory that so long as a plaintiff competes in the same market as a defendant and the defendant enjoys an unlawful advantage, the requirements for Article III standing are met.  But such a "boundless theory of standing" has been expressly rejected by the Supreme Court:

> Taken to its logical conclusion, the theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful — whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on.  We have never accepted such a boundless theory of standing.  The cases [the plaintiff] cites for this remarkable proposition stand for no such thing.  In each of those cases, standing was based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor.

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding that a group of businesses had standing to challenge, on Equal Protection grounds, the City of Jacksonville's ordinance granting preferential treatment to certain minority-owned businesses in the awarding of city contracts); and *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115 (1974) (holding that employers had standing to challenge, under the Labor Management Relations Act, New Jersey regulations that granted benefits to their striking employees)).

Accordingly, we reject the District and Maryland's argument that they have Article III standing based on harm to their proprietary interests.

B

The district court also concluded that the District and Maryland have *parens patriae* standing to protect the economic interests of their citizens, accepting the argument that the District and Maryland's "residents are harmed by the President's alleged violations of both Emoluments Clauses because the competitive playing field is illegally tilted towards the President's Hotel."  But, at bottom, the harm from which the

31

District and Maryland are purportedly seeking to protect their citizens is *exactly the same type of harm* that they allege has occurred to their own proprietary interests.  Their theory of *parens patriae* standing thus hinges on the same attenuated chain of inferences as does their theory of proprietary harm, and it accordingly suffers from the same defects.

The District and Maryland's reliance on *Massachusetts v. EPA*, 549 U.S. 497 (2007), provides them little help.  In holding that Massachusetts had standing to challenge an EPA decision, the Supreme Court relied on Massachusetts's own "particularized injury in its capacity as a landowner" and its "well-founded desire to preserve its sovereign territory," *id.* at 519, 522, as well as the procedural right and express cause of action provided to Massachusetts by Congress, *id.* at 520.  Neither factor is present here.

Thus, we reject the District and Maryland's argument for Article III standing based on their *parens patriae* interests.

## C

Finally, the district court concluded that the District and Maryland have standing based on injury to their quasi-sovereign interests, thus accepting the District and Maryland's argument that "[t]heir injury is the violation of their constitutionally protected interest in avoiding entirely pressure to compete with others for the President's favor by giving him money or other valuable dispensations" and that "it is the *opportunity* for favoritism that disrupts the balance of power in the federal system and injures the District and Maryland."

32

This alleged harm amounts to little more than a general interest in having the law followed. And the Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992). Rather, to seek injunctive and declaratory relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is *concrete and particularized*" and that "the threat [is] *actual and imminent, not conjectural or hypothetical*." *Summers*, 555 U.S. at 493 (emphasis added) (cleaned up); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016); *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 586 (1972) ("It is axiomatic that the federal courts do not decide abstract questions posed by parties who lack a personal stake in the outcome of the controversy" (cleaned up)); *Beck v. McDonald*, 848 F.3d 262, 271–76 (4th Cir. 2017). The District and Maryland's assertion of quasi-sovereign injury fails to satisfy these requirements.

Indeed, this theory of standing is strikingly similar to the theory rejected in *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974). The plaintiffs in *Schlesinger* alleged that certain members of Congress were violating the Incompatibility Clause, which provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office," U.S. Const. art. I, § 6, cl. 2. To support Article III standing, the plaintiffs claimed that they "suffered injury because Members of Congress holding a . . . position in the

Executive Branch were . . . subject to the possibility of undue influence." *Id.* at 212. The Court, with reasoning that is readily applicable here, concluded that the plaintiffs lacked standing:

> It is nothing more than a matter of speculation whether the claimed nonobservance of that Clause deprives citizens of the faithful discharge of the legislative duties of reservist Members of Congress. And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury. . . .
>
> The District Court acknowledged that any injury resulting from the reservist status of Members of Congress was hypothetical, but stressed that the Incompatibility Clause was designed to prohibit such potential for injury. This rationale fails, however, to compensate for the respondents' failure to present a claim under that Clause which alleges concrete injury. The claims of respondents here . . . would require courts to deal with a difficult and sensitive issue of constitutional adjudication on the complaint of one who does not allege a personal stake in the outcome of the controversy. . . .
>
> Furthermore, to have reached the conclusion that respondents' interests as citizens were meant to be protected by the Incompatibility Clause because the primary purpose of the Clause was to insure independence of each of the branches of the Federal Government, similarly involved an appraisal of the merits before the issue of standing was resolved. All citizens, of course, share equally an interest in the independence of each branch of Government. In some fashion, every provision of the Constitution was meant to serve the interests of all. Such a generalized interest, however, is too abstract to constitute a 'case or controversy' appropriate for judicial resolution. The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries.
>
> Closely linked to the idea that generalized citizen interest is a sufficient basis for standing was the District Court's observation that it was not irrelevant that if respondents could not obtain judicial review of petitioners' action, 'then as a practical matter no one can.' Our system of government leaves many crucial decisions to the political processes. The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.

*Id.* at 217, 224, 226–27 (cleaned up); *see also Richardson*, 418 U.S. 166 (holding that plaintiff lacked standing to sue to enforce the Accounts Clause, U.S. Const. art. I, § 9, cl. 7, which provides that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time"); *Ex parte Levitt*, 302 U.S. 633 (1937) (per curiam) (holding that plaintiff lacked standing to challenge Justice Black's appointment under the Ineligibility Clause, U.S. Const. art. I, § 6, cl. 2, which provides that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time").

As in *Schlesinger*, the District and Maryland's interest in constitutional governance is no more than a generalized grievance, insufficient to amount to a case or controversy within the meaning of Article III. *See Valley Forge Christian Coll.*, 454 U.S. at 482–87; *see also Schlesinger*, 418 U.S. at 222 ("To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing "government by injunction").

\*     \*     \*

The District and Maryland's interest in enforcing the Emoluments Clauses is so attenuated and abstract that their prosecution of this case readily provokes the question of whether this action against the President is an appropriate use of the courts, which were

35

created to resolve real cases and controversies between the parties.  In any event, for the reasons given, we grant the President's petition for a writ of mandamus and, taking jurisdiction under 28 U.S.C. § 1292(b), hold that the District and Maryland do not have Article III standing to pursue their claims against the President.  Accordingly, we reverse the district court's orders denying the President's motion to dismiss filed in his official capacity, and, in light of our related decision in No. 18-2488, we remand with instructions that the court dismiss the District and Maryland's complaint with prejudice.

PETITION FOR WRIT OF MANDAMUS GRANTED;
REVERSED AND REMANDED
WITH INSTRUCTIONS